The PEOPLE of The State of Colorado, Plaintiff–Appellant,

v.

Jaime Armando MENDOZA–BALDERAMA, Defendant–Appellee.

No. 98–SA460.

Supreme Court of Colorado, En Banc.

May 24, 1999.

Robert S. Grant, District Attorney, Seventeenth Judicial District, Michael J. Milne, Senior Deputy District Attorney, Brighton, Colorado, Attorneys for Plaintiff–Appellant.

H. Craig Skinner, Denver, Colorado, Attorney for Defendant–Appellee.

Justice SCOTT delivered the Opinion of the Court.

■■■ The Fourth Amendment of the United States Constitution protects citizens and their homes "against unreasonable searches and seizures."[1] The " 'touchstone of the Fourth Amendment is reasonableness.' " *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (quoting *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991)). Thus, a trial court, called upon to review the conduct of the police in the course of a challenged search, must determine whether the police acted in a manner that was "unreasonable." The "fact specific reasonableness inquiry," *Robinette*, 519 U.S. at 39, 117 S.Ct. 417, conducted by trial courts is, then, of paramount importance in determining whether a particular government action violates this fundamental constitutional guarantee.

The People (State) filed this interlocutory appeal to challenge an order of the Adams County District Court (trial court) suppressing evidence obtained during a search of the defendant's home after the defendant was arrested. Because the trial court did not first make clear its conclusion as to probable cause, and because the trial court's findings are not sufficient to support its secondary conclusion that the police entered defendant's home in the absence of exigent circumstances, we vacate the trial court's order. We return this matter to the trial court with instructions to make further findings, on this record or in its discretion after further proceedings, as to whether probable cause and exigent circumstances existed to permit a warrantless search of defendant's home.

I.

Born in Grand Junction, Colorado, Jaime Armando Mendoza–Balderama (defendant) is a twenty-seven-year-old citizen of the United States. For the past eight years, he has lived in both Mexico and the United States, traveling back and forth between the two countries. At the time of his arrest, the defendant lived in a mobile home in Thornton, Colorado, located in Adams County.

### A. The Arrest and Vehicle Search

On March 3, 1998, at about 3:30 p.m., a reliable informant contacted Detective Tom Sanchez (Detective Sanchez) of the Denver Police Department. The informant advised Detective Sanchez that a drug delivery would take place at a Taco Bell restaurant located at the 300 block of South Federal Boulevard in Denver. Detective Sanchez was advised that the defendant would be driving a purple Thunderbird containing a quarter kilogram of cocaine inside the trunk and that the cocaine was to be delivered to a person named Jose who would be driving a black RX7. Relying upon that information, Detective Sanchez and ten other officers set up surveillance at the Taco Bell. At approximately 4:30 p.m., both the defendant and the driver of the RX7 arrived at the Taco Bell.

---

1. The Fourth Amendment provides as follows:

    The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, particularly describing the place to be searched, and the persons or things to be seized.

    U.S. Const. Amend. IV.

Within minutes, having independently confirmed several details of the tip, including matching the defendant to a physical description provided by the informant, officers at the Taco Bell intervened, stopping both drivers. Detective Patrick Fitzgibbons (Detective Fitzgibbons), a narcotics investigator with 21 years of experience, approached the defendant and immediately informed him that he was under arrest. Another officer asked the defendant for permission to search the Thunderbird he was driving. The defendant refused to let the officers search the Thunderbird, explaining that it was his wife's car.

After defendant was taken into custody, the police transported him to a Denver police station. There, the defendant informed the police that his friend Jose had put drugs in the car and that there was a gun under the front seat. With that information, at about 7:30 p.m., Detective Sanchez obtained a warrant to search the Thunderbird. Shortly thereafter, the officers executed the search warrant and seized a 9 mm handgun and over 250 grams of cocaine from the trunk. The defendant was charged in the Denver District Court with possession of a controlled substance, based on the search of his car under a warrant issued for that purpose. That proceeding is not before us.

In Adams County proceedings based on charges arising out of a search of his home, the defendant was charged with unlawful possession with intent to distribute twenty-five grams but less than 450 grams of a controlled substance, pursuant to section 18–18–405(3)(a), 6 C.R.S. (1998), a class-three felony. At the request of the Denver police, the Thornton Police Department conducted a search of the defendant's home. It is that search which is the subject of defendant's Fourth Amendment challenge, and the State's appeal of the trial court ruling discussed more fully below.

The defendant pleaded not guilty and thereafter filed a motion to suppress evidence seized during a police search of his home. The motion claimed that the search was in violation of the Fourth Amendment of the United States Constitution and article II, section 7 of the Colorado Constitution.

On October 8 and October 30, 1998, the trial court conducted pretrial hearings on defendant's motion. For purposes of those proceedings, there was a general agreement as to events leading up to the defendant's arrest. However, the events following his arrest were very much in dispute. At the hearing, several police officers testified as to one version of facts regarding the search of the defendant's home. Contradicting the testimony of the police officers, the defendant offered evidence through his own testimony and the testimony of a second witness which suggests a different version of the events surrounding the search of his home.

## B. The Contradictory Testimony Regarding the Search of Defendant's Home

After his arrest, the defendant was taken to a Denver police station. There, Sergeant Richard Kroncke (Sergeant Kroncke) conducted a custodial interrogation of the defendant, which began at about 7:15 p.m.

### (i.)

According to the testimony of Sergeant Kroncke, at the outset, he verbally advised the defendant of his *Miranda*[2] rights. During the interrogation that followed, the defendant identified his residence as a mobile home located at 1201 West Thornton Parkway, in Thornton, Colorado. Sergeant Kroncke testified that he then asked if there were any narcotics or cocaine at the defendant's home; that the defendant informed him that cocaine was hidden in the bedroom of his home; and that the defendant consented to a search of his home. However, no other officers were present at the time the defendant gave Sergeant Kroncke verbal consent to search his home.

Acting on that information and the defendant's consent, Sergeant Kroncke asked the Adams County Sheriff's Department and Thornton Detective Randy Goin (Detective Goin) to conduct a consent search of the defendant's home.

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Detective Goin, who supervised the search at the defendant's home, also testified. Detective Goin testified that he and several other officers arrived at the defendant's home to conduct a consent search at approximately 8:00 p.m. Detective Goin decided to knock on the door rather than use a key they obtained from the defendant to enter the defendant's home.[3] Detective Goin further testified that after knocking, he saw a person look out the window by pulling back a paper presently covering the window in the front door. Detective Goin displayed his badge and announced "Police." He then saw the person run from the door and retreat elsewhere into the home. Detective Goin continued to knock for about fifteen seconds. In response, the door was opened by Daisy Martinez (Daisy), a juvenile and the daughter of Caroline Martinez (Martinez), who also occupied defendant's home.[4]

Fearing that evidence was being destroyed, Detective Goin and the other officers entered the home. Upon entering, the officers asked Daisy if she knew where Martinez was. Once inside the home, Detective Goin noticed a closed door in the bedroom area. He opened the door and observed drugs and drug paraphernalia. He next opened the door to the bathroom, where Martinez was located.

Detective Goin further testified that Martinez initially consented to a search of the home. Shortly after the search began, however, Martinez withdrew her consent. According to Detective Goin, Martinez did not withdraw her consent until after the officers discovered drugs and drug paraphernalia. When Martinez withdrew her consent, the officers immediately stopped their search and sought a search warrant. Utilizing information obtained as a result of the original entry, the officers did eventually obtain a search warrant. After the search warrant was issued, the officers immediately executed the warrant and seized a total of twenty-one items, including drug paraphernalia, three containers of substances believed to be cocaine, and 9 mm ammunition.

### (ii.)

The defendant and one other witness, Daisy, also testified at the hearing. The defendant testified that he was not advised of his *Miranda* rights, but he admitted that he signed an advisement form during his custodial interrogation. He further testified that he refused to give Sergeant Kroncke consent to conduct a search of his home. However, the defendant did not refute or contradict Sergeant Kroncke's testimony that he advised Kroncke that he routinely stored drugs at his house for a third party. Nor did the defendant offer any evidence to contradict Sergeant Kroncke's testimony that the defendant told him there were drugs hidden in the defendant's home.

Daisy testified that evening she walked a playmate home and immediately returned to the home she and her mother shared with the defendant. She testified that, upon returning, "I locked the door. We always lock the door." At about 8:00 p.m., while sitting in the main room by the front door, she began hearing noises coming from the front porch. She got up and approached the door, was "scared," but did not open the door. While standing in front of the door "all of a sudden" it opened and "all these cops came in the house." Although she stood close to the door, she testified that neither she nor Martinez opened the door, nor did they look out through the window in the door.[5]

Daisy further testified that once the police entered the front room, they asked her a few

---

**3.** The State contends that the defendant provided a key to the police when they asked for consent to search his home. The defendant testified that he never gave anyone a key to his home and that the police, without his consent, must have obtained his house key from the key ring holding the keys to the Thunderbird.

**4.** At the time of the search, there were only two occupants in the home: a twelve year old and her mother, defendant's fiancée. On cross-exam-

ination, Detective Goin was unable to identify which of the two occupants he had seen at the window.

**5.** Daisy also testified that there were several layers of newspaper securely taped over the inside of the window in the door for privacy and that if someone wanted to look out, they would have had to tear the paper away.

questions and then went into her mother's room. They then brought Martinez out to the front room and asked, "Where are the drugs?" Martinez replied, "Where's the search warrant?" Initially, the police did not answer her mother's question. When Martinez asked again, an officer replied that the defendant "gave them a written search warrant."

In the meantime, the police officers conducted a search "tearing up the place." Daisy further testified that other than asking "where are the drugs?" she never heard any of the officers ask Martinez for consent to search the house. During the search, Martinez was handcuffed. After the search was completed, Martinez and Daisy were taken to a police station.

### C. The Trial Court's Ruling

After hearing the conflicting testimony and taking into account the evidence and pleadings before it, the trial court made its findings on the record. In doing so, the trial court concluded defendant's arrest was supported by probable cause and that the police acted properly by conducting the search of the Thunderbird after obtaining a warrant. The trial court found that the defendant did not give his consent to a search of his home.

The trial court did not make any findings as to whether the defendant had told the police that there were drugs hidden in his home. The trial court also failed to make a factual finding regarding what happened when the Thornton Police and the Adams County Sheriff's Department arrived at the defendant's home. Nonetheless, the trial court concluded that the police entered the defendant's home in the absence of exigent circumstances. The trial court ruled as follows:

THE COURT: I'm going to find, first of all, that there was probable cause in the first instance to stop the defendant. . . .

And prior to the time that the defendant was placed into custody, any statements that he made—and I believe that one of the statements that he made prior to being placed into custody was, one, that there were drugs in the car; and, two, that there was a gun in the car—came in before

anybody took him into custody or placed him under arrest.

Now, subsequent to that, he was asked if they had his consent to search the car and he refused; and they simply then arrested him and took him into custody and took him to the Denver Police Department, [and] impounded the car. . . .

It was then that there was some questioning going on, and [I've determined that the defendant] was in custody. . . .

Then, apparently, there was some ongoing questioning with Detective Fitzgibbons; and Detective Fitzgibbons then advised the defendant of his *Miranda* rights. And upon being advised and being asked if he wanted to continue talking, he refused and the custodial interrogation ceased.

Now the People would have us believe that having refused to allow a search of his car and having refused to talk voluntarily to the officers after being mirandized, Mr. Mendoza–Balderama consented to a search of his premises. That is beyond my comprehension, don't think it happened, [I] find that it didn't. . . .

Now, we get to the search of the house, and I am aware that a house is different than a car. A house is different than almost anything. You have to prove the probable cause existed and exigent circumstances existed which justified the police acting in the absence of a warrant.

I've heard the testimony here over the last couple of hearings and . . . when it became apparent that the jurisdiction for the house was not in Sergeant Kroncke's area, not in Denver but in Adams County, that the police officers then went to the house.

And I have to find that, based upon what I've heard, that upon their arrival, I can't find any exigent circumstances that would justify the warrantless entry into the premises.

And I have reviewed the affidavit for a search warrant [for the house] which was subsequently prepared, and I'm going to suggest to you that if that affidavit or that search warrant had contained enough probable cause to issue a search warrant without using what the officers had ob-

served when they went in without the warrant the first time, I probably would find that everything they found subsequent to using the search warrant would be admissible. But they didn't.

Everything in the warrant, everything in the affidavit for the warrant, nearly everything, refers to what they observed when they made the unlawful entry into the house in the first instance. And so I'm afraid that, based upon the case law I'm familiar with, the material in the house, insofar as this motion is concerned, is suppressed.

The trial court thereby suppressed the evidence obtained from the search of the defendant's home. It is that ruling that is before us.

## II.

The Fourth Amendment to the United States Constitution and Article II, section 7, of the Colorado Constitution guarantee every citizen the right to be free from "unreasonable searches." [6] The "touchstone of the Fourth Amendment is reasonableness." *Jimeno*, 500 U.S. at 250, 111 S.Ct. 1801. It has generally been recognized that, without more, a warrantless search of a person's home is unreasonable. See *Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990); *People v. Hopkins*, 870 P.2d 478, 480 (Colo.1994).

■ A warrantless entry in order to search a person's home is presumptively unreasonable. See *People v. O'Hearn*, 931 P.2d 1168, 1173 (Colo.1997). The prosecution may overcome this presumption only by showing that one of the narrow exceptions to the warrant requirement existed at the time of the entry. See *People v. Jansen*, 713 P.2d 907, 911 (Colo.1986). Two of those exceptions, consent by the homeowner and exigent circumstances, are relevant here.

### A. Consent Justifies a Warrantless Search

■ A warrantless search may be justified and is constitutionally permissible when a citizen consents to the search. See *Schneckloth v. Bustamonte*, 412 U.S. 218, 243, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *People v. Drake*, 785 P.2d 1257, 1265 (Colo.1990).

■ "When the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given." *People v. Herrera*, 935 P.2d 956, 958 (Colo.1997) (citing *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)); *People v. Santistevan*, 715 P.2d 792, 795 (Colo.1986). The admissibility of evidence seized pursuant to an allegedly consensual search must stand or fall on the basis of the consent given before the search. See 3 Wayne R. LaFave, *Search and Seizure* § 8.1. (3d ed.1996).

### B. Probable Cause & Exigent Circumstances Justify a Warrantless Search

■ The warrantless entry into a person's home to conduct a search of that home constitutes an unreasonable search unless there exists both probable cause and exigent circumstances. See *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *O'Hearn*, 931 P.2d at 1175 (holding that exigent circumstances did not exist to justify warrantless police entry into defendant's home). When the police seek to enter a home without a warrant, the government bears the burden of proving that sufficient exigency existed to justify the warrantless entry and search. See *O'Hearn*, 931 P.2d at 1175; *Jansen*, 713 P.2d at 911.

■ Courts analyzing a claim that exigent circumstances excuse officers' failure to obtain a warrant should consider the investigatory context. In a rapidly developing situation where "probable cause matures in the field, there may be a greater likelihood that

---

6. The Fourth Amendment provides: "The right of the people to be secure in their ... houses ... against unreasonable searches and seizures shall not be violated." U.S. Const. Amend. IV. Similarly, the Colorado Constitution guarantees that "[t]he people shall be secure in their ... houses ... from unreasonable searches and seizures...." Colo. Const. art. II, § 7.

exigencies could arise which would make obtaining a warrant unreasonable." *State v. Smith,* 131 Wis.2d 220, 388 N.W.2d 601, 606 n. 5 (1986). Conversely, when the warrantless intrusion is "planned" based on an investigation at another location, claims of exigent circumstances are viewed with disfavor. As noted by professor LaFave, "[c]ourts have understandably been reluctant to accept police claims of exigent circumstances in these situations, for it ordinarily appears that whatever exigencies thereafter arose were foreseeable." 3 LaFave, *supra* § 6.1(f) at 271–72. The observation that a planned excursion to a private residence for purposes of making an intrusion does not ordinarily involve exigent circumstances "merely recognizes that the police can usually delay going out into the field to make an [intrusion] until a warrant is first obtained." *Id.* § 6.1(f), at 279.

■ We have recognized three general categories of exigent circumstances. Exigent circumstances may exist when (1) the police are engaged in a bona fide pursuit of a fleeing suspect; (2) there is a risk of immediate destruction of evidence; or (3) there is a colorable claim of emergency threatening the life or safety of another. *See Jansen,* 713 P.2d at 911.

■ Under the "risk of immediate destruction of evidence" exception, the police must have a reasonable suspicion that relevant evidence is in imminent danger of being destroyed. *See id.* at 911–12. In such cases, evidence seized pursuant to a search based on exigent circumstances may not be suppressed when a trial court finds both probable cause and facts supporting a reasonable belief by the police that there was an imminent risk that the evidence would be destroyed. *See* 3 LaFave, supra § 6.1(a) at 223–25.

## C. Reviewing Courts Must Defer to Trial Court Findings

■ We have recently been instructed that our Fourth Amendment jurisprudence turns on whether the conduct of offending officers meets the objective standard of "reasonableness." *Ohio v. Robinette,* 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996).

Reasonableness "is measured in objective terms by examining the totality of the circumstances." *Id.* at 39, 117 S.Ct. 417. In discussing the analysis that should be carried out by a detached and disinterested magistrate, the Supreme Court has "emphasiz[ed] the fact specific nature of the reasonableness inquiry." *Id.* It is the importance of this neutral scrutiny, examining the reasonableness of the police conduct in question, that places such great weight upon the factual findings and conclusions of the reviewing magistrate. And it is such a factual record upon which appellate courts will conduct their review of the trial court's ruling.

■ It is the function of the trial court and not the reviewing court to weigh the evidence and determine the credibility of the witnesses. See *People v. Thomas,* 853 P.2d 1147, 1149 (Colo.1993); *People v. Pearson,* 190 Colo. 313, 319, 546 P.2d 1259, 1263 (1976) (affirming trial court's finding of fact that consent was voluntary when supported by adequate evidence in the record); see also *United States v. Brisbane,* 931 F.Supp. 245, 247–48 (S.D.N.Y.1996) (suppressing evidence after finding incredible officers' testimony that defendant consented to search, and finding defendant credible); *United States v. Ruffino,* 592 F.Supp. 409, 415 (N.D.Ill.1984) (same); *Lopez v. State,* 663 S.W.2d 587, 590–91 (Tex.Ct.App.1983) (upholding trial court's resolution of two conflicting versions of the search in favor of officers' testimony that defendant had given consent).

■ When confronted with a choice of competing facts upon which the trial court has not passed, we are hesitant, as an appellate court, to weigh the evidence and determine credibility. The basis for this hesitance was well stated by Justice Lohr in *Gordon v. Benson,* 925 P.2d 775 (Colo.1996). There, writing for a unanimous court, Justice Lohr stated the following:

> In evaluating the testimony of a witness, a fact finder is not required to accept or reject the entire testimony. A witness can be correct in remembering one fact and incorrect in remembering another based on factors such as differences in opportunity to perceive and tricks of memory. A

witness also may falsify some parts of his or her testimony while otherwise testifying truthfully. It is therefore well established that the fact finder is entitled to accept parts of a witness's testimony and reject other parts.

*Id.* at 778 (citing *United States v. Cueto*, 628 F.2d 1273, 1275 (10th Cir.1980)) ("A jury may believe a part of a witness' testimony, and disbelieve other parts."); *see also United States v. Parr*, 516 F.2d 458, 464 (5th Cir. 1975) ("a jury may believe only part of a story, and disbelieve another part"); *People v. Wilson*, 838 P.2d 284, 292 (Colo.1992) (quoting with approval a jury instruction that "[y]ou may believe all of the testimony of a witness, or part of it, or none of it"); *People v. Wood*, 743 P.2d 422, 428 (Colo.1987) (same); *Maisel v. People*, 166 Colo. 161, 167, 442 P.2d 399, 402 (1968) (jury is entitled "to determine what part of an individual witness's testimony is to be believed and what portion is not to be believed"); *In re Marriage of Bowles*, 916 P.2d 615, 617 (Colo.App. 1995) ("finder of fact can believe all, part, or none of a witness' testimony, even if uncontroverted"); *People v. Hood*, 878 P.2d 89, 93 (Colo.App.1994) ("Because separate parts of [a witness's] testimony independently supported conspiracy and complicity, the jury could have believed those parts of the testimony relating to the conspiracy, but rejected the portions relating to defendant's participation in the murder as a complicitor.").

■ As the reviewing court, therefore, we must defer to the trial court's findings of fact. *See Herrera*, 935 P.2d at 958. In doing so, we will not substitute our judgment for that of the trial court unless its findings are clearly erroneous, *see United States v. Wright*, 932 F.2d 868, 878 (10th Cir.1991), or not supported by the record. *See Herrera*, 935 P.2d at 959.

Deference is given to the trial court's findings of fact and, as long as there is support for them, we will not overturn such findings. This is true even though a contrary position may find support in the record and even though we might have reached a different result had we been acting as the finder of fact.

*Thomas*, 853 P.2d at 1149.

Applying these principles, our task, then, is to examine the record and determine whether the trial court has made the necessary findings under the applicable standard, here exigent circumstances. In effect, on appellate review we must determine whether the court's conclusion that the search was not justified by exigent circumstances is supported by its findings set forth in the record.

## III.

The State argues that the trial court erroneously excluded evidence obtained from a search conducted with the defendant's consent. The State also argues that, based on the information the defendant gave to Sergeant Kroncke, the officers who arrived at the defendant's residence had a reasonable belief that cocaine was located inside the home and was about to be destroyed. Therefore, the State concludes that both probable cause and exigent circumstances justified the search. We cannot agree, however, because the record will not support a conclusion that the trial court found either probable cause or the absence of probable cause. Moreover, the factual findings of the trial court will not support a conclusion of exigent circumstances or the absence of exigent circumstances. Therefore, we are not persuaded by the State's arguments.

Because the trial court's findings of fact present an inadequate basis upon which to resolve these issues of law, we vacate the trial court's order and return this matter to that court for further findings as to probable cause, findings sufficient to support its conclusion regarding exigent circumstances, and for an order not inconsistent with this opinion.

### A. Defendant Did Not Consent to a Search of His Home

■ The trial court found that the defendant did not provide verbal consent for a search of his home, stating:

Now, the People would have us believe that having refused to allow a search of his car and having refused to talk voluntarily to the officers after being mirandized, [defendant] consented to a search of his prem-

ises. That is beyond my comprehension, don't think it happened, [I] find that it didn't.

Here, the trial court evaluated the testimony offered by both the State and the defense, and resolved the material conflicts in favor of the defendant. Because it is the function of the trial court, and not a reviewing court, to weigh the evidence, we are want to disturb the trial court's factual determinations which find support in this record. So long as there is evidence in the record that supports the trial court's factual findings, we are bound to uphold the trial court's conclusion that the defendant did not consent to the search and, hence, any search premised on the defendant's consent is unlawful. *See Herrera*, 935 P.2d at 958. Thus, the trial court need not make any further determinations regarding defendant's refusal to give his consent to a search of his home.

### B. Probable Cause and Exigent Circumstances

■ The State argues that the officers' search was supported by probable cause and exigent circumstances that justify their warrantless entry into the defendant's home, based, in large part, on the premise that the defendant informed the officers that there were controlled substances in the house. Furthermore, the State contends that the officers had a legitimate fear that there was imminent danger that evidence was being destroyed when they observed a woman suddenly retreat from the front door after the police identified themselves. Thus, the State claims, the trial court erred.

■ As we noted previously, both probable cause and exigent circumstances must be present in order to justify a warrantless search.[7] However, probable cause and exigent circumstances are not interchangeable elements. In order for exigent circumstances to be fully examined where the claim is premised upon the destruction of drugs,

there must first be a finding that the police knew drugs were located in the home, which in this case, is tantamount to a finding of probable cause. Therefore, when analyzing this warrantless search, the trial court should first make explicit findings to support a determination as to whether probable cause existed. If probable cause is found, then the trial court should continue its review, making explicit findings on whether the risk of imminent destruction of the drugs, or exigent circumstances, existed.

Here, however, the trial court found only that the police effected an entry into the defendant's home in the absence of exigent circumstances, without first making a probable cause determination:

Now, we get to the search of the house....

And I have to find that, based upon what I've heard, that upon their arrival, I can't find any exigent circumstances that would justify the warrantless entry into the premises.

And I have reviewed the affidavit for a search warrant [for the house] which was subsequently prepared, and I'm going to suggest to you that if that affidavit or that search warrant had contained enough probable cause to issue a search warrant without using what the officers had observed when they went in without the warrant the first time, I probably would find that everything they found subsequent to using the search warrant would be admissible. But they didn't.

■ In essence, the trial court ruled that the State's argument in reliance upon the officers' testimony as to the events surrounding the entry and subsequent search of defendant's home was not sufficient to meet its burden of proof. However, under the circumstances of this case, we are unable to determine whether the trial court reached this conclusion because it did not find that

7. A careful review of the record fails to reveal a finding by the trial court that defendant did or did not inform Denver police officers that drugs were hidden in his home, the very basis, the State argues, for probable cause to search the defendant's home. While the absence of such a finding is not conclusive as to whether or not the police, in fact, acted on probable cause, we are unwilling on this record to assume the absence of probable cause. If in fact, the defendant did reveal that he had drugs hidden in his home, as a matter of law, the police had probable cause and could obtain a warrant for a search.

the defendant informed the police of the existence of drugs in his home, therefore obviating any reasonable belief that the actions of an occupant retreating into the home at the announcement of "police" gives rise to a reasonable belief that the drugs were about to be destroyed. When police approach a home, the mere act of a citizen retreating to another area of the home when informed that police are seeking entry, in and of itself, will not support a reasonable belief on behalf of the police that there is a real threat that evidence will be destroyed. Hence, in the absence of a probable cause determination, we find it difficult to complete our review of the trial court's exigent circumstances conclusion.

If officers believe that someone on the premises knows of the drugs, is aware of imminent police intervention, and is in a position to easily dispose of the narcotics, then police might have reason to believe that the evidence was in danger of imminent destruction. *See, e.g., United States v. Turner,* 650 F.2d 526 (4th Cir.1981) (concluding that warrant not needed to enter premises to prevent destruction of evidence where defendant was arrested, and defendant's confederate who remained in the apartment and had witnessed the arrest, would be alerted to the need to destroy the evidence); *United States v. Fulton,* 549 F.2d 1325, 1327 (concluding that exigent circumstances existed to justify warrantless search where officers believed second person involved in the drug transaction who could dispose of the contraband was still in the motel room after defendant's apprehension by officer in the parking lot of the motel). Under the facts of this case, however, we are unable to determine the basis of such a fear by the police if they approached the defendant's home without information, provided by the defendant, that drugs were located in his home.

The credibility of the witnesses and the sufficiency of the evidence, its probative weight and effect, as well as the inferences and conclusions to be drawn therefrom are necessary to such a determination, and that finding is within the discretion of the trial court. *See Herrera,* 935 P.2d at 959 ("[W]e defer to the trial court, who hears the testimony and observes the demeanor of the witnesses."). Even though it is clear that the trial court's ruling indicates a deference to some of the testimony provided by the defendant and his witness, we are unable, on this record, to assume factual findings to uphold the trial court's conclusion that no exigent circumstances existed when the officers entered the defendant's home. Noting the limitations of our competence to make fact-findings on appeal, we must then remand this case to the trial court for limited findings.

On remand, because the trial court found that the defendant did not give his consent to a search of his home, it must now determine whether the warrantless search of defendant's home was justified. To do that, the trial court must first determine whether the defendant so informed Sergeant Kroncke that drugs were hidden in his home. If yes, then probable cause exists. If the defendant did not so inform Sergeant Kroncke, then the police acted without probable cause. If the trial court's findings support a probable cause determination, then the trial court needs to analyze the testimony previously provided and, based upon explicit findings, determine whether exigent circumstances justified the warrantless entry into the defendant's home. In making this determination, the trial court should consider the investigatory context, and particularly whether the claim of exigent circumstances can be justified in light of the officers' planned decision to proceed to the defendant's home for the explicit purpose of making a warrantless intrusion. Furthermore, the trial court should make clear whether it relied upon the defendant's witnesses' version of the facts or the State's version of the search of the defendant's home. If the trial court finds the entire testimony of Daisy Martinez to be credible, then its initial conclusion that exigent circumstances did not exist is correct, and the evidence seized should be suppressed. However, if the trial court finds that testimony not credible, and instead relies upon the testimony of the State's witnesses, the trial court needs to so state. In any event, the trial court should set forth the facts upon which its ultimate ruling rests.

## IV.

Accordingly, we vacate the trial court's order because the record findings will not support the trial court's conclusion that probable cause and exigent circumstances did not justify the police search of the defendant's home. We therefore return this matter to the trial court with instructions to make further findings, on this record or in its discretion after further proceedings, if necessary, to determine whether probable cause and exigent circumstances existed for a search of defendant's home. If the trial court determines that probable cause to believe drugs were hidden in the defendant's home did exist, then it must make findings on whether the warrantless search of the defendant's home was justified by a reasonable belief that the destruction of evidence was imminent, and hence, based upon exigent circumstances. Should the court make sufficient findings to support its original conclusion that exigent circumstances did not exist, it must suppress any evidence obtained in the course of an unlawful search.

Justice HOBBS dissents, and Justice MARTINEZ and Justice BENDER join in the dissent.

Justice HOBBS dissenting:

I respectfully dissent. I disagree with the majority's decision to remand this case to the trial court for further fact finding on the issue of exigent circumstances. Viewing the facts in the light most favorable to the state, and assuming without deciding that probable cause existed, the state did not meet its burden of proving the existence of exigent circumstances sufficient to justify searching the home for the drugs in the absence of a warrant. An appellate court should not overturn a trial court's ruling on a motion to suppress in order to require additional fact finding determinations that are not necessary when, as here, the trial court properly found and concluded that the state failed to sustain its burden in dispensing with a warrant.

Appellate review of a Fourth Amendment motion to suppress involves mixed issues of law and fact. While a trial court's factual determinations are subject to a clearly erroneous standard of review, a trial court's legal conclusions are subject to de novo review. *See People v. Romero*, 953 P.2d 550, 555 (Colo.1998)(determining that motion to suppress custodial statement involves mixed issue of law and fact, and that factual conclusions are subject to clearly erroneous standard of review, while legal conclusions are subject to de novo review); *see also* 5 Wayne R. LaFave, *Search and Seizure* § 11.7, at 403–04 (3d ed.1996)(stating that a Fourth Amendment motion to suppress involves both questions of fact and questions of law and are subject to different standards of review).

The question for decision in this case is whether the officers acted reasonably when they conducted a warrantless search of the defendant's home. A warrantless search of a home is presumptively unreasonable in the absence of both probable cause and exigent circumstances. *See People v. O'Hearn*, 931 P.2d 1168, 1175 (Colo.1997)("A warrantless search or seizure must be *reasonable* under the circumstances of the case.... [T]he state must prove the existence of probable cause to believe that a crime has been committed and exigent circumstances exist that justify acting in the absence of a warrant.") (emphasis in original); *see also People v. Kluhsman*, 980 P.2d 529, 534 (Colo.1999) ("In order to pass constitutional muster, searches and seizures of private property must be reasonable.").

### 1.

### *Real and Immediate Risk of Evidence Destruction*

In ruling on the suppression motion, the trial court correctly summarized the prosecution's burden: "You [the State] have to prove [that] probable cause existed and exigent circumstances existed which justified the police acting in the absence of a warrant." In considering the testimony of the witnesses at the suppression hearing, the trial court found and concluded that officers first conducted an unlawful search of the home and then relied upon their observations therein to obtain a warrant to seize evidence the state intends to utilize at trial. Specifically, the trial court stated: "Everything in the warrant, every-

thing in the affidavit for the warrant, nearly everything, refers to what they observed when they made the unlawful entry into the house in the first instance."

On the issue of whether exigent circumstances justified the warrantless entry of the home, Sergeant Kroncke testified that the defendant—after being advised of his *Miranda* rights——had stated that there was some cocaine in the bedroom of his home underneath a basket. According to the state's testimony, officers of the North Metro Task Force, with defendant still in custody, then went to the home to conduct a "knock-and-talk." When the officers knocked, one of the occupants of the home pulled back a paper from the door window and looked out. One of the officers displayed his badge, and the person ran from the door. The officers continued to knock. A twelve-year-old girl, defendant's stepdaughter, opened the door. Thereupon, the officers—afraid that drug evidence was being destroyed in the bedroom—entered the house and conducted a search. Ten or fifteen minutes into the search, one of the officers found a folded dollar which appeared to be a bindle commonly used for packing cocaine, whereupon the search was suspended in favor of obtaining a warrant. When the warrant arrived, the officers then seized drug paraphernalia and three containers of suspected cocaine.

Defendant's stepdaughter, the twelve-year-old girl, testified that paper was covering the window so that "you couldn't see through," that no one inside the house pulled back the paper to look through, that no one ran from the door, that she was scared when she heard noises outside the house, that no one knocked, and, finally, that the door flew open and officers entered the home.

Upon hearing witness testimony and considering the evidence as a whole, the trial court found and concluded that the state failed to prove the existence of exigent circumstances: "I can't find any exigent circumstances that would justify the warrantless entry into the premises." The trial court then proceeded to find that the search warrant the officers ultimately procured was based upon evidence obtained in the course of the illegal entry into the home. As a result, the trial court suppressed all evidence the officers saw or seized within the home.

The trial court correctly applied Fourth Amendment standards. The state failed to present any evidence at the suppression hearing that the risk of removal or destruction of the drugs was real and immediate during the time it would have taken to appear before a disinterested magistrate for a probable cause determination and issuance of a warrant based thereon. *See People v. Schafer*, 946 P.2d 938, 945 (Colo.1997)(stating that "the threat of evidence destruction [needs to] be real and immediate" and that "[t]he mere fact that evidence is of a type that can be easily destroyed does not, in itself, constitute an exigent circumstance"); *People v. Crawford*, 891 P.2d 255, 258 (Colo.1995)("Under the 'destruction of evidence' exception, the police must have a reasonable suspicion that relevant evidence is in immediate danger of being destroyed. ").

The trial court assumed, without deciding, that the officers had probable cause. Nevertheless, when police officers have probable cause for a search, it is presumed that they will proceed to the magistrate and then to the home if the warrant has been issued. As the Supreme Court stated in *Steagald v. United States*:

> The purpose of a warrant is to allow a neutral judicial officer to assess whether the police have probable cause to make an arrest or conduct a search.... [T]he placement of this checkpoint between the Government and the citizen implicitly acknowledges that an 'officer engaged in the often competitive enterprise of ferreting out crime,' may lack sufficient objectivity to weigh correctly the strength of the evidence supporting the contemplated action against the individual's interests in protecting his own liberty and the privacy of his home.

*Steagald v. United States*, 451 U.S. 204, 212, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981) (citation omitted).

With the defendant here in custody, the officers had no facts upon which to base a reasonable belief that the cocaine under the basket in the bedroom of the home would

soon be destroyed or removed. *See* 3 Wayne R. LaFave, *Search and Seizure* § 6.5(b), at 345 & n. 37 (3d ed.1996). "[I]f nothing has occurred which could be expected to alert the persons inside the premises that they were the object to police suspicion, the mere fact that persons are inside with evidence of a destructible nature is no basis for a warrantless search." *Id.* at 345.

The state has not contended that the defendant communicated with any of the occupants in his home after his arrest, nor did it present any evidence that anyone at the defendant's home knew that the police were on their way to the home. *See e.g., United States v. Richard,* 994 F.2d 244, 249 (5th Cir.1993)(determining that police presented no evidence that "room's occupants knew about [accomplice's] arrest, that they were aware they were being watched, or that they were destroying evidence"); *United States v. Radka,* 904 F.2d 357, 362 (6th Cir.1990)(stating that there was no "reasonable likelihood that the enforcement activity outside the premises would have come to the attention of anyone who might be on the property"); *United States v. Marshall,* 488 F.2d 1169, 1189 (9th Cir.1973)(concluding that those individuals who had been arrested "were in custody and had no way to communicate with the occupants").

In *Crawford,* 891 P.2d at 259, we articulated the following test for determining whether or not the police had a reasonable suspicion that relevant evidence is in imminent danger of being destroyed: "The correct test, however, is an objective test based on what the police reasonably could have expected a perpetrator in the defendant's position to do." In *Crawford,* based on our review of the record and contrary to the trial court's conclusion, we determined that exigent circumstances existed to justify the officers' warrantless search. *See id.* at 260. In that case, the defendant took the victim to his "place of business," threatened her with a razor blade and handgun, and forced the victim to perform oral sex and engage in

sexual intercourse. *Id.* at 257. In the morning, while the defendant was sleeping, the victim fled and called the police to report the offense. The police went to the defendant's place of business without a warrant because they feared the defendant, upon realizing the victim had fled, would attempt to remove or destroy the evidence. *See id.*

Moreover, the police suspected that the defendant had entered the premises illegally, based upon the victim's explanation of how she and the defendant entered the building. In light of the defendant's possible illegal entry, we reasoned that he had further incentive to remove evidence from the property and/or destroy it and then flee. Upon securing the crime scene, the police took four hours to obtain a search warrant because it was a Sunday morning. *See id.* at 260. Applying the objective test of whether it was reasonable for the police to expect a perpetrator in the defendant's position to remove or destroy the evidence, we concluded that there were exigent circumstances and upheld the warrantless search. *See id.*

In *Crawford,* we focused on the fact that it was the defendant himself who could destroy or remove the evidence and take flight. In the case now before us, the officers had no reasonable basis to suspect that the evidence would likely be destroyed. The state has not contended that the defendant, who, unlike the perpetrator in *Crawford,* was in custody, had contacted anyone at the home to inform them of his situation or that the officers might be on their way to seize the drugs.

In *Crawford,* we examined four factors relevant to finding exigency under the destruction of evidence exception:[1]

(1) the degree of urgency and the time required to obtain a warrant; (2) reasonable belief that evidence or contraband would be removed or destroyed, (3) the information that those in possession of the evidence or contraband are aware that the police are closing in, and (4) the ease of destroying the evidence or contraband and

---

1. "Exigent circumstances have been found to support a warrantless search in three situations: where '(1) the police are engaged in a bona fide pursuit of a fleeing suspect, (2) there is a risk or immediate destruction of evidence, or (3) there is a colorable claim of emergency threatening the life or safety of another.'" *Schafer,* 946 P.2d at 945 (citing *Crawford,* 891 P.2d at 258). In this case, the only situation relevant is the "risk of immediate destruction of evidence" exception.

the awareness that narcotics dealers often try to dispose of narcotics and escape under the circumstances.

*Id.* at 259. Applying the *Crawford* factors to the case before us, the state has not articulated (1) that there existed any urgency or shown why it would have taken a lengthy time to obtain a warrant before proceeding to the defendant's home; (2) any proof of the officers' reasonable belief that the evidence or contraband would be removed or destroyed in the time necessary to obtain a warrant; (3) any evidence that the occupants inside were aware of the defendant's arrest or that officers were "closing in" on the home; and (4) that the ease of destroying the evidence—in light of the existence of the first three factors—justified the officers in making a warrantless entry of the home. Thus, based upon the factors we relied upon in *Crawford,* the state has not justified its actions in proceeding into the home without a warrant.

### 2.

### *Warrantless Search*

The circumstances of the officers' warrantless presence at the home demonstrate the unreasonableness of this entry and search. At least eight to ten officers of the Adams County Sheriff's Department North Metro Task Force and Denver Police Department entered the defendant's home, according to the state's testimony. Defendant's twelve-year-old stepdaughter testified to the presence of additional officers: "I'd say about—there was eight in my mom's room, four in by my mom, three sitting by me, two in my room, three in the guest bedroom, two in the bathroom, so ... around 20."

This was a nighttime search in early March. The police officers arrived at the home between 8:00 and 8:15 p.m. When they went up to the door of the defendant's home, "[i]t was dark outside, [and] there was no porch light on," according to the state's testimony. The defendant's stepdaughter testified that she began hearing noises that sounded like footsteps outside of the home and she became frightened.

I agree with the majority that the testimony in the record conflicts in regards to what transpired from the time the officers arrived on the front porch. For example, it is unclear from the trial court's findings whether or not the officers knocked on the door before entering the home, whether or not the window on the door was covered or uncovered, or whether one of the occupants retreated to the back of the home after raising the paper covering the window.

Nevertheless, viewing the facts in the light most favorable to the state—that is, the officers saw one of the occupants lift the paper and then retreat without answering the door—the conduct of the occupants of the house in reaction to the officers' presence outside did not justify a warrantless search. Accepting the state's version, at least eight to ten officers converged on the house at night. In response, the occupants manifested alarm and retreat. The defendant was in custody. The officers did not seek a warrant to search the home. There was no evidence that the defendant had contacted the occupants of the home.

Under these circumstances, the actions of the officers created the "emergency" that evidence might be destroyed. Evidence gathered from an entry made solely on the basis of an alarm or retreat response by the occupants of the house cannot support a finding of exigent circumstances. *See e.g., United States v. Timberlake,* 896 F.2d 592, 597 (D.C.Cir.1990)(concluding that exigency resulting from officer's knocking on the door and shouting "police, police, open up" could not be relied upon to support a finding of exigent circumstances); *United States v. Rosselli,* 506 F.2d 627, 630 (7th Cir.1974)(concluding that emergency that arose from police's knocking on the door was foreseeable and therefore could not be relied upon to support finding of exigent circumstances, especially when police should have gotten a search warrant).

Proceeding to the house instead of the magistrate was not reasonable in this case. Just as the officers obtained a warrant to search the car—upon the defendant telling them about the presence of drugs therein—they could have obtained a warrant to search

the defendant's home—upon the defendant's statement that there was some cocaine under a basket in his bedroom. Within fifteen minutes of beginning the custodial interrogation of the defendant, the officers were able to obtain a search warrant for the defendant's car.[2]

Detective Tom Sanchez of the Denver Police Department testified that he had applied for a warrant to search the car because Detective Sanchez did not know exactly what the defendant, speaking in Spanish, had said. Under the same circumstances of language difficulty, the officers failed to take the same precautions and obtain a search warrant for the defendant's home. Yet, the privacy interest of a defendant in his home is even greater than in his car. *See Segura v. United States*, 468 U.S. 796, 820, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984)(Stevens, J., dissenting) ("Nowhere are expectations of privacy greater than in the home."); *Rakas v. Illinois*, 439 U.S. 128, 148, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)(stating that "cars are not to be treated identically with houses or Apartments for Fourth Amendment purposes").

3.

*Trial Court Findings of Fact and Conclusions of Law*

The events that transpired in this case differ from circumstances where the police

officers reasonably attempt to obtain consent for the entry and search. As we stated in *O'Hearn*, "[t]he Fourth Amendment right of the people to be free from unreasonable searches and seizures is not violated when the holder of the right provides the searching officer with voluntary consent to enter the premises." *O'Hearn*, 931 P.2d at 1173. As in *O'Hearn*, the trial court specifically found that the defendant had not given the officers his consent: "Now, the People would have us believe that having refused to allow a search of his car and having refused to talk voluntarily to the officers after being mirandized, Mr. Mendoza–Balderama consented to a search of his premises. That is beyond my comprehension, don't think it happened, find that it didn't."

The officers testified that the twelve-year-old's mother consented to their search of the home *after* they were already inside the home. However, when they arrived at the house, there was no consent given for their initial entry.[3] It is unreasonable for the police officers to make an illegal entry into a home in order to seek consent from a person therein. Once the officers were inside the home, they spoke with the mother. They told her that the defendant had provided them with consent to search the home. The officers testified that, after relaying this information to her, the mother consented to the search of the home.[4] However, the trial

2. Sergeant Kroncke conducted a custodial interrogation of the defendant at about 7:15 p.m. By 7:30, the officers had obtained a search warrant for the car. Detective Goin testified that he and several other officers arrived at the defendant's home at approximately 8:00 p.m.

3. Specifically, Detective Shaklee testified to the following:

Well, the juvenile female opened the door. And it was believed that there may be some evidence that was immediately being destroyed in the bedroom to the residence, so officers entered the—essentially the threshold of the doorway and asked the juvenile female where her mother was, something to that effect. And at that point the adult female was observed coming out of the doorway to the bedroom and officers immediately went to that area to make sure that there wasn't evidence being destroyed.

Additionally, Detective Goin testified to the following:

When the door was opened I could see a big room. And there was a closed door off to my right and I asked the juvenile female, Where is your mom, and she pointed to the closed door. So since it appeared that while—since I had seen a female run from the door and we knew that there was supposed to be cocaine in the residence and we identified ourselves as police officers, I went to the location where there was the closed door where the mother was supposed to be, believing that she might be there destroying evidence.

4. Specifically, Detective Shaklee testified to the following:

[W]e explained to her that, yes, Jamie Mendoza–Balderama had been arrested by Denver police officers for the possession of drug charges and had given his consent to search the trailer and his vehicle.... She allowed us to search. She didn't object to that search and, in fact, she told us to go ahead, and the detectives began searching the master bedroom area.

court resolved this factual dispute concerning whether the defendant consented to the search of his home by finding that he had not consented. We may not set this finding aside.

The state has not contended in its brief that officers obtained consent from an occupant for the initial entry into the house. Rather, the state focuses on the defendant's alleged consent and, in the alternative, argues that exigent circumstances arose upon their arrival. These are the contentions that the trial court's findings and conclusions resolved against the state.

After finding lack of consent, the trial court found that there were not sufficient facts to support a finding of exigent circumstances: "I have to find that, based upon what I've heard, that *upon their arrival*, I can't find any exigent circumstances that would *justify* the warrantless entry into the premises." (Emphasis added.) We should uphold this finding and the trial court's conclusion of law based thereon. An officer testified that the defendant told them that there were drugs in the home. Knowledge of one officer is imputed to the others in the context of probable cause. *See* 2 Wayne R. LaFave, *Search and Seizure* § 3.5(c), at 265–66 (3d ed.1996)(stating that it is generally permissible to determine the existence of probable cause based on the collective information known by the law enforcement organization as a whole as long as there is communication between the officers). Accordingly, the officers could have proceeded to a magistrate on the issue of probable cause for a search warrant before proceeding to the defendant's home. *See* 3 Wayne R. LaFave, *Search and Seizure* § 6.5(b), at 345 (3d ed. 1996)("[I]n cases where police did not avail themselves of an earlier opportunity to get a warrant, this has been a dominant factor in the holdings that there were not exigent circumstances.")

Fourth Amendment jurisprudence discourages police officers from showing themselves at the door or window of a person's home to see what may develop because of their presence, such as alarm or retreat by the occupants therein. *See Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)("At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."). "Exigent circumstances ... do not pass Fourth Amendment muster if the officers deliberately create them." *United States v. Richard*, 994 F.2d 244, 247 (5th Cir.1993). "Unreasonable 'physical entry of the home' is the 'chief evil' against which the Fourth Amendment is directed." *O'Hearn*, 931 P.2d at 1172. Moreover, "[i]ntrusion into a home at night exacerbates this wrong." *Id.*

The trial court made several probable cause determinations. It determined that the officers had probable cause to initially stop the defendant, that probable cause existed for the search warrant for the car, and that the search warrant issued subsequent to the warrantless entry lacked probable cause. However, the trial court did not make an express finding as to whether the police had probable cause for a search of the defendant's home. Although it would have been better practice for the trial court to have made this determination, it chose instead to first examine whether the state had met its burden of demonstrating exigent circumstances.

Given that the trial court had already made three probable cause determinations, I do not infer from the record that the trial court simply forgot to make the fourth determination. Rather, the trial court assessed the testimony as a whole and determined that there was nothing to support the existence of exigent circumstances and that making the additional probable cause determination was unnecessary. Because one of the prongs of the two-part test for proceeding without a warrant had not been met, the trial court appropriately concluded that the state had failed to sustain its burden of proof. Thus, the trial court did not err in bypassing

---

Additionally, Detective Goin testified to the following: "I told her that we were here with the Denver Police Department, that they had arrested her boyfriend and that he had provided consent for us to search the home. And she didn't object and some of us started searching in the bedroom area there."

whether probable cause existed to search the home.

### 4.

### *Appellate Role*

Under the circumstances of this case, we need not vacate and remand for additional trial court fact finding. Our appellate review is not hindered. Whether or not an occupant of the home raised the paper covering the window and then retreated without answering the door is not determinative here. Because the trial court correctly found and concluded that consent to search the house had not been obtained from the defendant and that the state had not proved the applicability of the warrant exception, based on the evidence in the record as a whole, we should be upholding rather than vacating and remanding its suppression order. We uphold findings of a trial court unless clearly erroneous. *See People v. D.F.*, 933 P.2d 9, 14 (Colo.1997)(stating that appellate courts give deference to the trial court's factual findings supported by competent evidence in the record and will not set aside such findings unless they are clearly erroneous); *see also Crawford*, 891 P.2d at 258 ("When the police seek to enter a home without a warrant, the government bears the burden of proving that sufficient exigency existed to justify the warrantless search and seizure.")

The trial court carefully considered its suppression order findings. For example, it clearly identified which facts it used to make *Miranda* determinations, which facts it used to conclude that the defendant did not consent to a search of his home, and which facts it used to exclude any evidence found subsequent to using the search warrant for the premises. Nevertheless, the majority vacates the trial court's suppression ruling for further fact finding. In doing so, the majority fails to accord proper deference to the trial court's role.

When there· is evidentiary support in the record for the trial court's legal conclusion that the state has failed to meet its burden of proof, we typically defer to its ruling. As we stated in *People v. Herrera*, 935 P.2d 956, 958 (Colo.1997), "[w]e give deference to the trial

court's findings of fact and rule that there is evidence to support the trial court's conclusion that the prosecution failed to meet its burden [of proof]". *See also People v. Guerin*, 769 P.2d 1068, 1071 (Colo.1989)(upholding as reasonable the trial court's conclusion that exigent circumstances were not present, and stating that "[i]t was the trial court's prerogative to determine from the evidence whether the prosecution proved that exigent circumstances existed").

Here, the trial court made a finding that exigent circumstances did not exist to justify the officers' warrantless entry. It did so after carefully considering all of the evidence and ascertaining the *absence* of facts necessary to support the prosecution's burden of proof. Pointing out the non-existence of facts, when ascertaining whether a burden of proof has been met, is a trial court function. In *Herrera*, 935 P.2d at 958, the trial court made an analogous finding of fact. Specifically, upon making a determination as to the voluntariness of a consent to search, the trial court stated: "I think looking at the totality of the circumstances, the only thing that I have on the other side is—is Mr. Spence's testimony, and I'm not calling him a liar, and certainly wouldn't do that, but what he says simply doesn't outweigh all of the other evidence I have." *Id.*

In the case before us, all the evidence of exigent circumstances favorable to the state is not sufficient to sustain its burden, as the trial court properly found and concluded:

I've heard the testimony here over the last couple hearings and, even assuming that, based upon what Mr.—what I'm assuming now is this portion of the findings is that Mr. Mendoza–Balderama was not as forthcoming as the officers said because I think that he refused the search of his car, he refused the opportunity to say anything after being advised in writing.

And after Sergeant Kroncke apparently had turned the questioning over to someone else, when it became apparent that the jurisdiction for the house was not in Sergeant Kroncke's area, not in Denver but in Adams County, that the police officers then went to the house.

And I have to find that, *based upon what I've heard,* that upon their arrival, I can't find any exigent circumstances that would justify the warrantless entry into the premises.

(Emphasis added.)

Based on the evidence of record in this case, the trial court correctly concluded that the state failed to prove the existence of exigent circumstances justifying a warrantless entry of the defendant's home. Accordingly, I respectfully dissent.

I am authorized to say that Justice MARTINEZ and Justice BENDER join in this dissent.